J-A28036-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PAULETTA FRITZ AND RANDALL FRITZ | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1327 EDA 2023 |
| RYAN P. WITMER | : | |

Appeal from the Judgment Entered May 19, 2023
In the Court of Common Pleas of Lehigh County
Civil Division at No(s):  2019-C-0801

BEFORE:   OLSON, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                         **FILED JULY 17, 2024**

Pauletta Fritz and Randall Fritz ("Appellants") appeal from the judgment of $67,000 that was entered following a jury trial in the personal injury lawsuit Appellants brought against Appellee Ryan P. Witmer.[1] On appeal, Appellants, *inter alia*, contest various evidentiary determinations stemming from the admissibility of certain expert testimony. Following a thorough review of the record, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] As indicated, *infra*, this amount was later augmented by the court following Appellants' post-trial unopposed motion for delay damages and record costs. Resultantly, the total award was increased to $75,706.55. **See** Order, 12/20/22. This amount increased even further when Appellants filed their Notice of Filing Judgment pursuant to Pennsylvania Rule of Civil Procedure 236. **See** Notice of Filing Judgment, 5/19/23 (reflecting a judgment against Witmer of $77,660.40).

As cogently summarized by the lower court:

This personal injury lawsuit arises out of an April 13, 2017 motor vehicle accident at the intersection of Liberty Street and Albright Avenue in Allentown, Pennsylvania. On that day, Mrs. Fritz and a passenger were driving approximately 25 mph west on Liberty Street. Mrs. Fritz saw … Witmer stopped at the stop sign at Albright Avenue; Mrs. Fritz did not have a stop sign and continued through the intersection. … Witmer did not see Mrs. Fritz's vehicle and he began to drive into the intersection where the cars collided. Mrs. Fritz's front driver's side came into contact with … Witmer's front passenger side. … Witmer's car continued forward with the passenger side of his car scraping along the front driver's side of Mrs. Fritz's car. Mrs. Fritz applied her brakes prior to the accident. Air bags did not deploy and … Witmer was able to leave the accident scene in his vehicle. Mrs. Fritz's car was towed and later totaled. She took pictures at the scene, removed all items from her vehicle, and had a friend drive her home. Later that day, Mrs. Fritz drove herself to the emergency room at a nearby hospital complaining of hand, neck, and head pain, and nausea.

On March 18, 2019, [Appellants] commenced this lawsuit by writ of summons. Subsequently, a complaint was filed asserting claims of negligence and loss of consortium. [Witmer] filed an answer and new matter after preliminary objections were overruled. Discovery issues and motions *in limine* were ruled on prior to trial. [Witmer] stipulated that his negligence was the sole cause of the accident leaving the jury to determine what personal injuries were caused by the accident and the damages related thereto.

A jury trial was held from December 5, 2022 through December 12, 2022. On December 12, 2022, the jury returned a verdict in favor of Mrs. Fritz and against Mr. Witmer in the amount of $67,000. The damages were awarded as follows:

Past medical expenses: $20,000

Future medical expenses: $25,000

Past lost earnings: $5,000

Future lost earning capacity: $7,000

Past Present and future non-economic damages: $10,000

The jury did not award damages for Mr. Fritz's loss of consortium claim.

The [v]erdict was filed with the Clerk of Judicial Records, Civil Division on December 13, 2022. On December 20, 2022, and upon consideration of [Appellants'] unopposed motion for delay damages, the verdict was molded to include delay damages and record costs for a total award of $75,706.55.

On December 21, 2022, [Appellants] filed [additional] [p]ost-[t]rial [m]options; [Witmer] responded on January 3, 2023. [Ultimately, on April 20, 2023, the lower court denied Appellants' post-trial motions seeking a new trial. Judgment was thereafter entered on May 19, 2023.]

Trial Court Opinion, 4/20/23, at 1-3 (record citations omitted).

After filing a timely notice of appeal and complying with their obligations under Pennsylvania Rule of Appellate Procedure 1925, Appellants present six issues for our review:

1. Did the trial court commit an error of law or abuse its discretion by failing to preclude or limit the testimony of Victor Malatesta, Ph.D.?

2. Did the trial court commit an error of law or abuse its discretion in permitting the divulging/exploitation of Mrs. Fritz's psychological/psychiatric information when Appellants never made a claim for psychiatric or psychological harm, forcing Mrs. Fritz to provide the jury with limited disclosure of what was already ruled to be protected information?

3. Did the trial court commit an error of law or abuse its discretion in permitting evidence that Mrs. Fritz was on Social Security Disability prior to and after the accident, and forcing her to disclose it was for non-physical reasons and in permitting other evidence of psychological diagnoses into evidence, requiring a

new trial on damages?

4. Did the trial court commit an error of law or abuse its discretion in refusing to permit Appellants to introduce evidence of the Medicare Lien and to advise the jury that Mrs. Fritz had to pay back the lien out of any recovery of medical expenses made in this case and in refusing to admit the PIP Log and exhaustion of first party medical benefits, requiring the grant of a new trial?

5. Did the court commit an error of law or abuse its discretion by excluding relevant testimony from Brian Greenwald, M.D.?

6. Was the verdict on damages against the weight of the evidence, requiring a new trial on damages?

*See* Appellants' Brief, at 3-4.

With five of Appellants' six claims challenging the trial court's evidentiary determinations, we note the following standard of review:

The Superior Court's standard for reviewing the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case. We will reverse the trial court's denial of a new trial only where there is a clear abuse of discretion or an error of law which controlled the outcome of the case. The trial court abuses its discretion when it misapplies the law or when it reaches a manifestly unreasonable, biased or prejudiced result. Abuse of discretion may occur through an honest, but erroneous use of discretion. A new trial may not be granted merely because the evidence conflicts and the jury could have decided for either party. The grant of a new trial is appropriate, however, where the jury verdict may have been based on improperly admitted evidence.

* * *

Questions regarding the admissibility or exclusion of evidence are also subject to the abuse of discretion standard of review. Pennsylvania trial judges enjoy broad discretion regarding the admissibility of potentially misleading and confusing evidence. Relevance is a threshold consideration in determining the admissibility of evidence. A trial court may, however, properly

exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Generally[,] for the purposes of this evidentiary rule, "prejudice" means an undue tendency to suggest a decision on an improper basis. The erroneous admission of harmful or prejudicial evidence constitutes reversible error.

*Rohe v. Vinson*, 158 A.3d 88, 95 (Pa. Super. 2016) (citation omitted).

In their first and second issues, Appellants contend that the lower court failed to grant their motion *in limine* to preclude, or substantially limit, Dr. Malatesta's testimony. *See* Appellants' Brief, at 13. The gravamen of their argument is that, at no point throughout the course of litigation, did Mrs. Fritz claim she had a "psychological-psychiatric injury." *Id*. However, she was "forced" by the court to undergo "neuropsychological testing" performed by Dr. Malatesta, notwithstanding the fact that she had a privilege to withhold psychiatric information and did "not make a claim for a diagnosable psychological injury as a result of the accident." *Id*., at 13-15, 19; *see also* 42 Pa.C.S. § 5944 (statutory psychologist/patient-client privilege, treating communications "on the same basis as those … prescribed by law between an attorney and client[]"); Pa.R.Civ.P. 4010 (allowing the court to order a party who has placed his or her mental or physical condition in controversy to submit to a physical or mental examination).

In support, Appellants cite *Gormley v. Edgar* for the proposition that "general averments of shock, mental anguish and humiliation" are "general allegations" that "neither place a party's mental condition at issue nor result in a waiver of privilege." 995 A.2d 1197, 1205 (Pa. Super. 2010). However,

"allegations of mental injury, severe emotional trauma requiring treatment, or psychiatric/psychological conditions may, if otherwise relevant, result in a waiver of privilege[.]" ***Gormley***, 995 A.2d at 1205.

Distilled down, Appellants take fault with Dr. Malatesta expressing opinions as to Mrs. Fritz's overall psychological condition, which fell outside of his specialty as "a neuropsychologist[.]" Appellants' Brief, at 25, 29 ("The jury was misled by him being qualified as a neuropsychologist."). Dr. Malatesta's testing, resulting in a diagnosis of, *inter alia*, adjustment disorder with anxiety, was used against Appellants at trial by attacking Mrs. Fritz's "credibility by raising things like secondary gain, motivations for testifying, and other reasons why her complaints cannot be believed because of her psychological makeup." ***Id***., at 25-26. Appellants assert that, without the proper expertise or adequate nexus to the scope of Mrs. Fritz's asserted injuries, Dr. Malatesta's opinion as to his psychological testing of Mrs. Fritz should have been "excluded." ***Id.***, at 30.

The trial court's well-supported rationale in concluding that Appellants were not entitled to post-trial relief on this basis was as follows:

> In 2019, [Witmer] sought to discover information related to Mrs. Fritz's past psychological and psychiatric conditions. [Appellants] objected to the discovery requests. On July 6, 2020, [Witmer] filed a [a motion to strike Appellants' objections]. The court ruled in favor of [Appellants] because the discovery request sought documentation and testimony related to Mrs. Fritz's privileged, physician-patient communications and thus [was] not discoverable in this case. None of Mrs. Fritz's pre-accident mental health treatment records were subject to discovery. This ruling pertained specifically to a discovery request for pre-accident

mental health treatment records. At no time did the court deviate from that ruling. …

Also on July 6, 2020, [Witmer] filed [a motion to strike Appellants' objections to multiple independent medical examinations]. As to this motion, the court ruled in favor of [Witmer] providing him the opportunity to prepare his defense. [Appellants] specifically averred the following in their [c]omplaint:

9. As a direct and proximate result of the above-described occurrence, the Plaintiff, Pauletta Fritz, has sustained serious and severe injuries, including, but not limited to, a sprained left thumb and wrist, concussion, post-concussion syndrome, nausea, pain in hand, superior oblique palsy in right eye, in jury to her left arm, injuries to her neck, back and discs, etc.

Accordingly, Mrs. Fritz placed her physical and mental condition at issue in this case, and, pursuant to Pa.R.C[iv].P. 4010, the independent medical examinations were proper.

While the Order of October 27, 2020, made specific reference to an independent medical examination (["]IME["]) by Dr. Peter Badgio, the doctor specifically named by [Witmer] in the motion, the examination was not, in fact, completed by Dr. Badgio. Dr. Malatesta was substituted for Dr. Badgio and the IME was completed by Dr. Malatesta. The court had no involvement in this substitution. The court order of October 27, 2020[,] simply directed Mrs. Fritz to attend and participate in the IMEs, and, additionally, permitted [Appellants] to have counsel or another appropriate person attend the examinations.

[Appellants] try to build on this order for the proposition that the doctor was only to conduct a neuropsychological examination of Mrs. Fritz. No such order directs that. While [Witmer's] motion provided "[i]n order to prepare a defense, at a minimum, Independent Medical Examinations by physicians in the fields of orthopedics, neuro-ophthalmology and neuro-psychology are necessary," the specifics of the IME [were] neither sought by counsel nor defined by the court. If [Appellants] read the order to mean that the doctor was permitted to perform certain specific examinations on Mrs. Fritz, then they are in error.

[Appellants] point to a portion of Dr. Malatesta's report

- 7 -

where he indicated:

> "To manage the situation, I refrained from formal neuropsychological testing and instead conducted a neurobehavioral status exam with enhanced mental status testing and psychological testing."

Without any authority for this proposition nor supported by cross examination, [Appellants] assert that the tests performed led to psychological conclusions, not neuropsychological conclusions. The court finds nothing in the written motions, briefs, argument, or other expert opinions to support [Appellants'] position in this regard. Fundamentally, Dr. Malatesta, a neuropsychologist, performed testing within his field of expertise on Mrs. Fritz, penned a report based upon the testing and opined to a medical degree of certainty during his testimony all of which was appropriate and within the proper standards for evidence in the trial. …

[Appellants] wish to stand on the statement that since they have not made a claim for psychiatric or psychological harm resulting from the accident, [Witmer] cannot assert a psychiatric or psychological defense as to damages incurred as a result of the accident. To permit that would improperly preclude [Witmer] from defending against the opinions of [Appellants'] experts.

[Appellants] are critical of the questions Dr. Malatesta posed to Mrs. Fritz during the IME regarding her psychiatric and sexual abuse history. Mrs. Fritz ably refused to answer Dr. Malatesta's questions in this regard. Dr. Malatesta did testify "Ms. Fritz told me that she had been advised by her attorney to not answer any of those questions." [Appellants'] counsel did not object to this statement by Dr. Malatesta either during the testimony or in [Appellants' corresponding filing outlining objections during the videotape depositions].

Trial Court Opinion, 4/20/23, at 5-10 (citations omitted) (footnote omitted).

Preliminarily, we note the unclear nature of Appellants' argument. Appellants invoke, or at least allude to, the import of the psychologist/patient-client privilege as it relates to the present matter, but the precise

"communications" Appellants seek to claim privilege on are not identified. Section 5944 "pertains only to confidential communications between psychiatrists or psychologists and their patients/clients that were made in the course of *treatment*, not to all records and documents regarding mental health treatment." **Gormley**, 995 A.2d at 1204 (citation omitted) (emphasis added). As Dr. Malatesta was not Mrs. Fritz's treating psychiatrist or psychologist, the statute is not implicated based solely on the fact that an IME was performed in this case. Assuming, *arguendo*, that Appellants are claiming that Dr. Malatesta compelled Mrs. Fritz to disclose her communications with her treating psychiatrist or psychologist during the IME, Appellants have failed to highlight where, precisely, in his report he improperly relied on or considered Mrs. Fritz's communications with her providers.

Notwithstanding this infirmity, Appellants contest whether they placed Mrs. Fritz's "mental condition" in controversy, which, by order of court, led to an IME that was, as Appellants argue, erroneously psychological in nature. **See** Pa.R.Civ.P. 4010(a)(2) ("When the mental … condition of a party … is in controversy, the court in which the action is pending may order the party to submit to a … mental examination by an examiner[.]"); **see generally** Appellants' Brief, at 13-26. Appellants take issue with Dr. Malatesta having provided "purely psychological diagnoses[.]" Appellants' Brief, at 29.

We do not find that the trial court abused its discretion in finding that Appellant placed her mental health in controversy such that it was permissible

for the trial court to order a neuropsychological IME. In their complaint, Appellants allege, *inter alia*, that Mrs. Fritz "has sustained serious and severe injuries, including concussion, post-concussion syndrome, [and] nausea[.]" Complaint, ¶ 9. Mrs. Fritz's report of mental effects from the April 13, 2017 car accident was confirmed by her report to Dr. Malatesta during her IME, as well as her testimony at trial, that she suffered from, *inter alia*, forgetfulness, memory problems, "brain fog," anxiety, distractedness, and sleeping issues following the crash. Report of Dr. Malatesta, 4/20/21, at 6; N.T., 12/8/22, at 164-69. While these injuries may have arisen from the physical injuries Mrs. Fritz sustained, we cannot fault the trial court's determination that they also have some mental component to them that would at least allow Dr. Malatesta to conduct the neuropsychological testing that he performed.

Dr. Malatesta indicated that he "had the opportunity an independent neurobehavioral status examination with psychometric testing." Report of Dr. Malatesta, 4/20/21, at 1; ***see also*** Deposition of Dr. Malatesta, 11/3/21, at 6 (Dr. Malatesta indicating that he is a neuropsychologist who "deals with the effects of brain functioning on human behavior, thinkings and emotions[]"), 12 (Dr. Malatesta testifying that he has been qualified in Pennsylvania courts as a "clinical neuropsychologist[]"). After conducting a "reasonable, thorough assessment of Mrs. Fritz from a neuropsychological perspective[,]" ***id***., at 23 (disclaiming, however, that he "did not do his customary test battery[]"), he diagnosed her with "adjustment disorder" and further stated that this disorder

- 10 -

"highlights the role of anxiety, her symptom-focus, and situational factors that are contributing to the persistence of Ms. Fritz' complaints." Report of Dr. Malatesta, 4/20/21, at 10, 12.

After consideration of the lower court's rationale in admitting Dr. Malatesta's report, Appellants have failed to demonstrate that the court committed an abuse of discretion either in admitting the report, itself, or allowing for the corresponding IME to be performed. While Appellants claim that Dr. Malatesta's report resulted in psychological conclusions rather than neuropsychological conclusions, seemingly conceding that latter would have been permissible, **see, e.g**., Appellants' Brief, at 22 ("The purpose of neuropsychological testing is to test brain function through performance-based testing of [a] patient's capabilities. That is what [Mrs. Fritz] thought she was submitting herself to at the [c]ourt's [o]rder."), they have not shown that any of Dr. Malatesta's testing or his resultant conclusions were not germane to Appellants' underlying cause of action nor relevant to Witmer's defense. In particular, Appellants did not demonstrate with any degree of clarity, either in the trial court or before this Court, the distinction between psychological and neuropsychological testing and how or when Dr. Malatesta allegedly crossed the line by straying into a purely psychological examination. Instead, we are left with a record wherein Dr. Malatesta unequivocally testified that he performed "neuropsychological tests[,]" Deposition of Dr. Malatesta, 11/3/21, at 30, which directly corresponded with Witmer's request, and the court's

subsequent granting of, an IME for neuropsychological purposes. *See* Order, 10/27/20 (granting Witmer's motion that sought, *inter alia*, a "neuro-psychology" IME). Appellants are thus not entitled to relief on their first and second claims.

Appellants next argue that the court erred in permitting evidence establishing that Mrs. Fritz was on Social Security Disability Insurance ("SSDI") for some twenty years prior to the automobile accident. *See* Appellants' Brief, at 39 (stating that Mrs. Fritz had been on SSDI "beginning in or around February[] 2002"). Appellants argue that the collateral source rule, which "prohibits a defendant in a personal injury action from introducing evidence of the plaintiff's receipt of benefits from a collateral source … for the same injuries which are alleged to have been caused by the defendant," Appellants' Brief, at 44 (citations and emphasis omitted), applies to the present matter. Although Appellants concede that Witmer was prohibited from examining the specific dollar amount Mrs. Fritz received from SSDI, it constituted "prejudicial error" as the jury would be led to believe that its tax dollars were already going to her. *Id*., at 46-47.

The only pieces of authority cited by Appellants on this claim are those defining the collateral source rule. However, the collateral source rule is not implicated here as it prevents the introduction of evidence of benefits from a collateral source for the *same injuries* alleged to have been caused by the defendant. *See Navarak v. Waite*, 216 A.3d 1093, 1101 (Pa. Super. 2019).

As written by the lower court:

> [Appellants] seem to be arguing that because the court did not provide a blanket prohibition on [Witmer's] counsel regarding statements and questions regarding Mrs. Fritz's receipt of [SSDI] that the court erred and violated the collateral source rule. [Appellants] misread the collateral source rule and try to stretch it to include [SSDI] stemming from something other than from the injuries which are alleged to have been caused by [Witmer]. The collateral source rule does not pertain to the receipt of [SSDI] that Mrs. Fritz was receiving well before the accident. The collateral source rule pertains to payments that may have been made by Social Security that [Appellants] may have been seeking to recover from [Witmer] in this case. Nothing presented at trial deviated from the court's ruling precluding evidence related to collateral source payments. Collateral source payments were not presented to the jury.

> \*\*\*

> With the assertions [in her complaint] regarding present and future mental and physical suffering, great financial loss, loss of various aspects of life, inability to pursue her usual occupation for extended periods of time, suffering lost wages, lost employment benefits and loss of earning power and capacity by virtue of her injuries sustained from the accident, the court could find no valid reason to preclude [Witmer] from exploring relevant questions regarding the receipt of [SSDI]. … [T]here was a connection between the allegations raised by [Appellants] and permitting [Witmer] from asking relevant questions.

Trial Court Opinion, 4/20/23, at 11-15 (footnote omitted).

Given the wide latitude afforded to lower courts concerning the admission of evidence, we see no reason to deviate from the court's conclusions and consequently find no basis for Appellants to obtain relief. Simply put, the collateral source rule did not prohibit the jury from hearing that Mrs. Fritz was on SSDI, and Appellants have presented no other basis for the court to have excluded that evidence.

- 13 -

In their fourth contention, Appellants aver that they should have been allowed to introduce evidence of a Medicare lien which had to be paid back out of any recovery of medical expenses. Moreover, Appellants assert that the court erred in refusing to admit "the [Periodic Interim Payments ("PIP")] Log and exhaustion of first party medical benefits." Appellants' Brief, at 51. Appellants claim that it was their "choice on whether to admit the lien and argue to the jury that it had to be paid back out of the award." *Id*., at 53, *citing **Nazarak***, 216 A.3d at 1102 (finding no abuse of discretion in permitting that plaintiff to "introduce evidence of [a] workers' compensation lien in his pursuit of damages[]").

Despite Appellants' suggestion, ***Nazarak*** does not compel the court to accept lien-related evidence offered by a plaintiff. Instead, this Court held in ***Nazarak*** that it was not an abuse of discretion by the lower court to permit such evidence. ***See*** 216 A.3d at 1107. Stated differently, just because such documents evidencing a lien are admissible does not mean, *ipso facto*, they must be admitted.

Here, Appellants admit that the jury received stipulated evidence that Mrs. Fritz's total medical bills amounted to $31,111.09. ***See*** Appellants' Brief, at 52 n.15. Of that amount, $26,593.13 was subject to the Medicare lien. ***See id***. Although Appellants argue that "[t]he admission of simply a number representing past medical expenses left open the possibility the jury might discount the amount if they thought that the charged amount was the billed

amount, and that paying the full amount of the bill would end up overpaying [Appellants] for the item of damage actually sustained[,]" *id*., at 52, Appellants provide no support for this position. While, under *Nazarak*, it was permissible for the court to allow evidence of Mrs. Fritz's Medicare lien, the Appellants fail to show how the jury receiving the total amount of her medical expenses, which included the Medicare lien, constituted an abuse of discretion.

As to the PIP log, the lower court found that Appellants were "unable to articulate any case law or jury instruction that provided support to [the] position that the PIP, first party benefits, was relevant or required for the jury to know. PIP, first party benefits[,] are neither admissible into evidence nor subject to subrogation under 75 Pa.C.S. §§ 1720[,] 1722." Trial Court Opinion, 4/20/23, at 23. Although Appellants mention the PIP log in the first paragraph of their argument section, it is never discussed independent of the Medicare lien. Because Appellants failed to develop their argument concerning the PIP log in any meaningful fashion capable of review, we find that this claim is waived. *See Wirth v. Commonwealth*, 95 A.3d 822, 837 (Pa. 2014); *Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018).

In their fifth issue, Appellants believe that the court "improperly and prejudicially precluded testimony from" their medical expert, Brian Greenwald, M.D. Appellants' Brief, at 55. Appellants then highlight specific portions of his testimony which had been stricken from the recording of his deposition that was played to the jury. Specifically, Appellants take fault with testimony being

stricken due to both Dr. Greenwald's qualifications and the content of his testimony. As to the former, Appellants believe that Dr. Greenwald had the competency to testify as a neuropsychologist and further possessed the ability to opine on both the degrees of force involved in an automobile accident and the resultant effects on one's head. As to the latter, Appellants believe that Dr. Greenwald's testimony should not have been stricken based on his contention that Dr. Malatesta's opinions were not useful or stricken as a usurpation of the jury's fact-finding function; Appellants further assert that Dr. Greenwald's belated references to Mrs. Fritz attending both a doctor's and psychiatrist's visit, appointments not referenced in his original report, were permissible for discussion at the deposition. ***See id***., at 55-62.

The court indicated that:

> Dr. Greenwald testified as an expert in the field of physiatry and as a board certified brain injury medicine specialist. On cross examination as to credentials, Dr. Greenwald acknowledged that he is not a neurologist, neurosurgeon, neuro-ophthalmologist, psychiatrist, psychologist or neuro[-]psychologist.
>
> ***
>
> The court sustained [Appellants'] objections as they were all beyond the scope of Dr. Greenwald's report.
>
> ***
>
> Dr. Greenwald had reviewed the report of Dr. Malatesta and referenced that fact in his own report by listing "Report of Dr. Victor Malatesta" under the heading of "Records Reviewed". Additionally, Dr. Greenwald testified that he had reviewed Dr. Malatesta's report. An entire review of Dr. Greenwald's report finds only the following with regard to Dr. Malatesta:

Dr. Victor Malatesta, neuropsychologist evaluated Ms. Fritz on behalf of the defendant with a report date of 4/20/2021. He was aware of all the treatment for Ms. Fritz required for the concussion and orthopedic injuries that she sustained on 4/13/2017. He discussed the ongoing musculoskeletal and cognitive complaints that Ms. Fritz has as a result of the 4/13/2017 accident. Ms. Fritz needed frequent breaks during the testing. Testing was noted to be valid and reliable. He notes that she was status post motor vehicle accident with the emergency room diagnosis of cervical strain and left wrist sprain. He notes a questionable outpatient diagnosis of concussions/postconcussion syndrome which he reports was resolved. His opinion is that the postconcussive symptoms are resolved is in contrast to Ms. Fritz is (sic) treating doctors.

At no point in Dr. Greenwald's report did he opine as to the type of testing performed by Dr. Malatesta or the usefulness of testing to a treating doctor.

With regard to the office note from the visit with Dr. Feldman which took place in October 2021, as well as the office note from the visit with Dr. Goldberg which took place in September 2021, these visits took place after the date of Dr. Greenwald's report which was dated July 1, 2021. As such, there is no reference to either of these office notes in Dr. Greenwald's report.

Finally, Dr. Greenwald provided no analysis or opinion in his report regarding a comparison of force from an auto accident and force from walking. Although [Appellants'] counsel argues that the above question posed during redirect examination was to rehabilitate the witness, nothing in the cross examination elicited information about an independent comparison of types of force. In fact, Dr. Greenwald was quite clear during the cross examination that all of his opinions regarding Mrs. Fritz's condition were based upon the records he had reviewed. None of those records reviewed by Dr. Greenwald have been illustrated to support the inquiry by [Appellants'] attorney for an opinion not contained in Dr. Greenwald's report about comparisons of different types of force.

If permitted to testify as questioned in all of the above instances, Dr. Greenwald would have been offering testimony

beyond the fair scope of his report preventing [Witmer's] counsel from preparing a meaningful response. These new avenues of inquiry of Dr. Greenwald were wholly inconsistent with his report and impermissible.

Trial Court Opinion, 4/20/23, at 23-26 (record citations omitted).

We emphasize that

the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.Civ.P. 4003.5(c).

Our Court has applied Rule 4003.5(c) thusly:

[I]t is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, the substance of the facts and opinions to which the expert is expected to testify is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

**_Hassel v. Franzi_**, 207 A.3d 939, 951 (Pa. Super. 2019) (internal citations and quotations omitted).

As described above, the complained-of portions of Dr. Greenwald's testimony were stricken following objections by Witmer because, *inter alia*, Dr. Greenwald's testimony exceeded the scope of his pre-trial report. We discern no abuse of discretion by the lower court in finding that Dr. Greenwald exceeded the fair scope of his report. Of particular note, Dr. Greenwald's analysis, which were predicated on two post-report medical visits, were clearly unfair to Witmer. **See** Appellants' Brief, at 57 (conceding that the two-at issue medical issues occurred after the submission of Dr. Greenwald's report and stating that "[i]t is not possible or realistic to have a running commentary in expert reports after every office visit so close to the trial deposition[]"). Having presented no authority compelling the opposite result, Appellants have not, on appeal, convinced us that it was an abuse of discretion for the court to have excluded this testimony.

Furthermore, as to his qualifications, it is entirely unclear how Dr. Greenwald's title as the "head of a head injury clinic," Appellants' Brief, at 56; **see also** Deposition of Dr. Greenwald, 11/2/21, at 9, 16-17 (Dr. Greenwald stating that he is the "Director of the Center for Brain Injury … at the JFK Johnson Rehabilitation Institute" with training as "a physician" dealing with "physical medicine" and specializing in "brain injury rehabilitation[]"), granted him the ability to render an opinion on neuropsychological examinations. Dr. Greenwald was admittedly not a psychologist nor a neuropsychologist. **See** Deposition of Dr. Greenwald, 11/2/21, at 18. Therefore, without having the

requisite scientific background, it was not an abuse of discretion for the court to strike Dr. Greenwald's attempt, as a physician, to opine on Dr. Malatesta's competency as a neuropsychologist. While Dr. Greenwald may have overseen "a lot of neuro[-]psychologists" as part of his role as Director, *id*., at 67, Appellants have presented no basis to show how this overseeing role provided him with the requisite scientific skill to contradict or qualify any of Dr. Malatesta's conclusions. *See* Pa.R.E. 702.

As to the portions of Dr. Greenwald's testimony discussing the degrees of force that are involved in a car accident, *see id*., at 115-17, Appellants tersely argue that the "subject matter [was not] beyond the expertise of [a] board-certified head injury specialist." Appellants' Brief, at 61. Other than highlighting Dr. Greenwald's testimony and providing the conclusory statement that he "has the training and experience to know the answer to [the force-related] question far above any lay person," Appellants' Brief, at 62, Appellants have not demonstrated that the lower court abused its discretion in striking this portion of his testimony.

Lastly, Appellants maintain that the jury's verdict was against the weight of the evidence. For weight of the evidence claims, we are guided by the following precepts:

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when

> reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*In re Estate of Smaling*, 80 A.3d 485, 490 (Pa. Super. 2013) (citation omitted). "The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Samuel–Bassett v. Kia Motors America*, *Inc*., 34 A.3d 1, 39 (Pa. 2011). The trial court may award a new trial "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Id*. (citation omitted). When a fact finder's verdict is "so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking." *Farelli v. Marko*, 502 A.2d 1293, 1295 (Pa. Super. 1985) (quoting *Green v. Johnson*, 227 A.2d 644, 644, 645 (Pa. 1967)).

Appellants specifically argue that the verdict was against the weight of the evidence as to: (1) past medical expenses; (2) future medical expenses; (3) wage loss; (4) past, present, and future pain and suffering, embarrassment and humiliation and loss of enjoyment of life; and (5) loss of

consortium. As to past medical expenses, Appellants assert that because it was stipulated that Mrs. Fritz's past medical bills totaled $31,111.09, an award of $20,000 by the jury was against the weight of the evidence. *See* Appellants' Brief, at 66. Appellants further argue that "[t]he jury had no basis for randomly discounting the reasonable and necessary medical expense which had been stipulated to and proven by [Appellants'] four different physicians[.]" *Id*., at 68.

Regarding future medical expenses, Appellants "presented evidence of over $215,460 in future medical expense for her head injury, which was a conservative estimate because it did not include charges for pain management, which she needs." *Id*., at 70. Instead, the award of $25,000 for future medicals "was a random number[.]" *Id*., at 71.

On past and future wage loss, Appellants baldly fault the awards that they received, suggesting that the $12,000 aggregate amount "was impacted by the fact that the [c]ourt admitted evidence she was on [SSDI.]" *Id*., at 72.

For future pain and suffering, which amounted to $10,000, Appellants illuminate that the "extent of pain and suffering has been serious and very debilitating to date over the last approximately 5 ½ years, and these conditions extend into the future over her 19 year life expectancy." *Id*., at 73. At this amount, Appellants have "clearly not been compensated for the admitted and undisputed injuries that she has sustained," where Mrs. Fritz "has gone to over 250 medical visits in the past 5 years[.]" *Id*., at 74.

On loss of consortium, "[t]he jury's verdict of $0 for loss of consortium was clearly against the weight of the evidence … in the face of clear and undisputed evidence of the existence of loss of consortium by [Mr.] Fritz." *Id*.

In rejecting Appellants' position, the court found:

> This case had two theories: [Appellants] asserted that as a result of the car accident, Mrs. Fritz sustained various physical injuries, including a brain injury, that caused a long list of symptoms/complaints, and that she has and will continue to suffer from these injuries permanently. [Appellants] provided medical testimony to support their theory. [Witmer's] theory was that this was a minor car accident with minor injuries. Both drivers were driving between 20-25 mph and no air bags deployed. [Witmer] conceded the physical injuries of strain and sprains of the neck, back, both shoulders and left wrist, but denied there was a concussion or, in the alternative, if a concussion was sustained it resolved within a short period of time. [Witmer] provided medical testimony to support his theory. The jury was free to accept or reject each side's theory. … The jury awarded damages accordingly.
>
> ***
>
> [As to past medical expenses,] the uncontradicted evidence was that Mrs. Fritz suffered a strain and sprain to her neck, back, both shoulders and left wrist and that the medical bills claimed by [Appellants] to have been incurred due to the accident was $31,111.09. The jury was left to determine whether Mrs. Fritz suffered any additional injuries related to the accident, specifically: a concussion, post-concussion syndrome and/or mild traumatic brain injury, and, if so, what complaints, if any, were related to the concussion, post-concussion syndrome or mild traumatic brain injury. The jury then needed to award the past medical expenses for the treatment of the stipulated injuries and any additional injuries determined to be caused by the accident, up to and including the stipulated amount of $31,111.09. The jury awarded $20,000 in past medical expenses.
>
> ***
>
> Dr. Malatesta's original opinion was that substantial

evidence did not exist to support a finding that Mrs. Fritz sustained a concussion during the car accident, but a concussion was not ruled out. Dr. Malatesta indicated that based on information discussed during his cross examination regarding Dr. Kracht's medical records, additional evidence existed that increased the possibility that Mrs. Fritz sustained a concussion, but his original opinion that she did not sustain a concussion, while not ruling out the possibility that she did sustain a concussion, did not change. Therefore, the jury was free to determine whether or not Mrs. Fritz sustained a concussion during the accident, and, if they found she did not sustain such an injury, reduce the past medical damages.

Additionally, Dr. Malatesta's opinion was that if she did suffer a concussion as a result of the accident, she would have followed the most common outcome and would have had full resolution within a couple of weeks to three months. Dr. Malatesta's opinion gave the jury substantial evidence to find that Mrs. Fritz did not sustain a concussion as a result of the accident, but, if she did, her course of treatment as a result of injuries due to the accident resolved by August of 2017.

Similarly, there were additional differences in the medical opinions expressed regarding Mrs. Fritz's complaints related to the concussion and whether they were caused by the accident. Dr. Malatesta testified that Mrs. Fritz "endorsed 26 different problems along with additional complaints" four years post-accident, which is not typical. Some of the complaints included: visual disturbance, blurred vision, ear ringing, trouble walking, and dropping things, light and sound sensitivity, sleep disturbance, losing time, forgetfulness, not thinking as quickly or clearly, feeling distracted, problems with word finding and speech, trouble following conversations, trouble reading and writing, problems with driving, managing her paperwork, along with stress, tension and anxiety.

Mrs. Fritz's pre-accident history including a diagnosis of fibromyalgia, a generalized pain condition, excessive daytime sleepiness, chronic colitis, irritable bowel syndrome, anxiety and depression. She had previously treated for memory loss, changes in handwriting, sleep disturbance, impaired concentration, disturbance in her gait, sensitivity to light and sound and other cognitive complaints. Mrs. Fritz had an MRI of her brain in 2011 due to memory loss and myalgias.

Dr. Malatesta had Mrs. Fritz perform the Montreal cognitive assessment procedure. Her functioning on attention, concentration, language having to do with fluency, naming, reading, spelling, writing, comprehension, [and] pronunciation were all completed without error. He found her reasoning and brief memory in tact. Dr. Malatesta found Mrs. Fritz has no ongoing restrictions or limitations related to the accident and does not require any future treatment. Mrs. Fritz had an MRI of the brain after the accident for post-concussive syndrome which was negative/normal.

Similarly, Mrs. Fritz's vision symptoms and complaints were examined by Doctor Kenneth Shindler, M.D., Ph.D., a neuro-ophthalmologist, a doctor trained in examining patients with vision problems caused by neurologic issues and nerve damage. Dr. Shinder found Mrs. Fritz's exam to be normal except for some very minor findings. Her eye motility, both fast and slow pursued eye movements, were normal. The alignment of her eyes were lined up … as they are expected to be and when she looked up close, she had two to four units of trouble crossing, which was well within the normal limits. The insides of her eyes were healthy on examination; she had very mild cataracts not to the point of affecting her vision, and she had a little bit of inflammation of the oil glands in her eyelids.

Trial Court Opinion, 4/20/23, at 27-32. After summarizing the extensive testimony that the jury heard from Appellant's medical experts as to Mrs. Fritz's condition, the court continued:

[Ultimately,] [t]he jury received contradictory expert evidence from both sides of this case. Evidence existed to support a finding that Mrs. Fritz's subjective complaints did not match the objective results of the tests she was asked to perform, which would support the jury finding that not all of her injuries existed. Additionally, evidence existed for the jury to find that Mrs. Fritz's complaints were not caused by the car accident as they were complained of in 2004, 2011, and 2012.

\*\*\*

[On the issue of future medical expenses,] it was within the jury's purview to determine that Mrs. Fritz needed some, but not

all of the future treatment suggested by Dr. Greenwald. …

[Witmer] provided evidence to support a finding that not all of the injuries would have continued from the time of the accident until the time of trial or beyond[.] …

[In particular,] [i]t was within the jury's discretion to determine that physical therapy and vestibular therapy were no longer required for Mrs. Fritz's care [allowing for the exclusion of] $190,000 [from the total] amount requested from their award.

***

[As to past and future wage loss, the jury receiving knowledge that] Mrs. Fritz was unable to work a full-time job or earn over a certain monetary amount … certainly could have impacted the amount of wage loss damages the jury awarded, but not unfairly.

Mrs. Fritz was self-employed. [The evidence presented established that Mrs. Fritz made between $4,000 and $11,000 of profit in the five years preceding the accident and two years after the accident.]

In 2020, Mrs. Fritz closed her three business, pet sitting, house cleaning, and elder care, due to COVID.

[Through the jury's award of $5,000 in past lost earnings, reflecting the years 2017, 2018, and 2019, when added to the profits of those years, it made her average net profits higher than the three prior years' net profit amounts.]

Regarding future lost earnings, the jury awarded $7,000. In determining future los[t] earning and earning capacity, the jury was to consider the type of work [Mrs. Fritz] did in the past or was capable of doing based on her physical condition, education, experience and age and type of work Mrs. Fritz is able to do in the future based on her physical condition, education, experience, and age. …

Mrs. Fritz did not work full time prior to the accident. … [While, *inter alia*,] Dr. Sexton indicated that Mrs. Fritz is without physical limitations or restrictions[,] … the jury provided for future lost earnings to compensate for lost earnings caused by her

continued injury for the amount of time she would continue working (at the time of trial, Mrs. Fritz was 67). …

[On past, present, and future pain and suffering, embarrassment and humiliation and loss of enjoyment of life, the jury clearly] did not find all of [Mrs. Fritz's] injuries and treatment credible. [Appellants] have gone to the Jersey Shore several times since the accident and to Virginia Beach area three times since the accident. … Mrs. Fritz's remaining injuries and treatment have continued to improve and have permitted her to do the things she loves, with some limitations, including: driving, pet sitting and house cleaning, gardening, attending concerts, church, and family functions. The jury hearing the testimony of [Mrs. Fritz] and [Appellants'] expert and witnesses and determined that $10,000 is fair compensation for the past and future non[-]economic loss.

Finally, [Appellants] assert the $0 verdict for Mr. Fritz's loss of consortium claim is against the weight of the evidence. Looking at the unique facts of this case, and reviewing the deprivation to Mr. Fritz, the jury evaluated the testimony regarding the affection, support, comfort, companionship, assistance and sexual relations and society Mrs. Fritz provided to Mr. Fritz prior to the accident. There was no evidence presented by [Appellants] as to sexual relations. All other aspects of the consortium claim had contradicted evidence and sufficient evidence to support the jury's determination that Mr. Fritz was not entitled to an award.

*Id.*, at 27-40 (citations omitted). The court noted that Mrs. Fritz moved out of the marital home and lived with a friend from 2014 to 2016, as she was having a difficult time with Mr. Fritz. *See id*., at 40. Although she returned to the marital home in 2016, she testified that her marriage to Mr. Fritz was "a little distant[.]" *Id*. Moreover, Mr. Fritz worked out of state for long periods of time prior to and when the accident occurred. *See id*. Mr. Fritz did not return to see Mrs. Fritz after the accident until his next scheduled break, which was a few weeks thereafter. *See id*., at 40-41. Simply put, "[t]here was no evidence that Mr. Fritz was impacted at all from the time of the accident in

2017 through the [termination of his employment due to Covid-19 in 2020]."
*Id*.

Upon review of the trial court's rationale in finding that that the verdict was not against the weight of the evidence, we conclude that it was not an abuse of the court's discretion in finding that the verdict reached was not against the weight of the evidence. At all five of Appellants' purported bases for seeking a new trial, there existed evidentiary support for the jury to formulate its damages amounts in the ways that it did. The jury was free to disbelieve the evidence presented by Appellants and instead rely on that provided by Witmer. With the jury's findings having been predicated on record support, none of the jury's discrete conclusions shock one's sense of justice.

As none of Appellants' contentions warrant relief, we affirm the judgment entered in this matter following the denial of post-trial relief.

Judgment affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date:   7/17/2024